UNITED STATES of America,
Plaintiff–Appellee,

v.

Jerry Wayne MAYFIELD,
Defendant–Appellant.

No. 98–50100.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 1999.

Decided Aug. 26, 1999.

896

Michael Tanaka, Deputy Federal Public Defender, Los Angeles, California, for the Defendant-Appellant.

Orly Degani, Assistant United States Attorney, Los Angeles, California, for the Plaintiff-Appellee.

Before: DOROTHY W. NELSON, REINHARDT, and TROTT, Circuit Judges.

DOROTHY W. NELSON, Circuit Judge:

## OVERVIEW

Jerry Wayne Mayfield appeals his conviction, after a joint jury trial with codefendant Manyale Gilbert, for possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Mayfield argues that the district court abused its discretion by refusing to sever the trials despite Gilbert's mutually exclusive defense and prejudicial evidence that was improperly elicited by Gilbert's counsel. Although the district court's initial denial of Mayfield's severance motion was understandable, based on pretrial representations made by the government about the evidence that would be admitted, the district court abused its discretion when at trial it gave Gilbert's counsel free rein to introduce evidence against Mayfield and act as a second prosecutor. Gilbert's counsel's trial tactics necessitated severance or some alternative means of mitigating the substantial risk of prejudice. We thus reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 10, 1997, Los Angeles Police and FBI agents executed a search warrant at 2073 E. 102nd Street, Unit 495 in the Jordan Downs Projects in Los Angeles ("the apartment"). The officers surrounded the apartment, knocked, announced their presence, and waited 20 to 50 seconds before forcing their way in. LAPD Detective Brian Agnew entered and proceeded to the kitchen where he found Gilbert sitting in a chair at a table and holding an infant in one arm. Agnew testified that he observed Gilbert moving what appeared to be rock cocaine off a cutting board that was on the table.

LAPD Detective James Jimenez was one of the officers assigned to the rear door. While at the back door, he testified that he looked through a screen door and saw Gilbert and Mayfield sitting at a kitchen table. When Agnew began knocking, Jimenez said he saw Mayfield stand up and leave the apartment through the rear door. LAPD Officer Christian Mrakich also testified that he saw Mayfield come out of the apartment through the rear door.

The police arrested Mayfield outside the back door of the apartment. Officer Mrakich asked Mayfield if he had any keys, and Mayfield responded that he did not. A pat-down search of Mayfield revealed keys that fit the locks to the front and rear security doors of the apartment. The search also revealed $1,929 in cash and a pager.

On the kitchen table inside the apartment, the officers discovered several clear plastic sandwich baggies, some containing pieces of rock cocaine, a razor blade, a triple-beam scale, a cutting board, and a shoe box containing a larger quantity of rock cocaine. Gilbert's fingerprint was found on the scale. Additionally, the officers found in the kitchen a pyrex beaker with a stir stick inside and a four-month-

old phone bill addressed to Gilbert at the apartment.

After the police issued the search warrant, Gilbert was detained and made the following statement,

O.K., The guy outside is Jerry Mayfield and he is the main man. I sell for him but you can't tell him or no one. They will kill me for sure. I ain't going to sign nothin [sic]. I don't know where [sic] gets the keys. I know he got a delivery today. I can't tell you no more.

Gilbert and Mayfield were both indicted for one count of possession with the intent to distribute approximately 552.8 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1). They were tried jointly. Before trial, the government indicated in its exhibit list that it intended to offer this statement of codefendant Gilbert during the joint trial. Mayfield objected to the admission of this hearsay statement, arguing that he could not receive a fair trial because he would not be able to cross-examine the declarant, Gilbert. Mayfield pointed out that if the trials were severed, the statements would only be admissible in his trial if Gilbert testified personally, thus allowing Mayfield the opportunity to cross-examine him. If the court chose to allow the statements, however, Mayfield requested that his name be redacted and that a proper limiting instruction be given.

The district court admitted the statement but agreed that Mayfield's name should be removed and instructed the government to "clean up" the statement. On direct examination, the government elicited from the police officer that Gilbert had stated, "that he was helping *an individual* in the sales of cocaine." On cross-examination, however, Gilbert's attorney questioned the officer further about Gilbert's statement:

Q. Did Mr. Gilbert say—after further questioning, did Mr. Gilbert say a person was the "main man"?

A. Yes.

Q. Did Mr. Gilbert use the words "main man"?

A. Yes.

Q. Did Mr. Gilbert say, "I sell for him, but you can't tell him or no one. They will kill me for sure"?

A. Yes.

Q. Did Mr. Gilbert indicate to you that he would not sign anything?

A. Yes, he refused to sign—well, he didn't refuse to sign originally. But in the statement you just read regarding killing him, yes, he refused to sign that.

Q. Did Mr. Gilbert indicate that anybody had gotten a delivery that day?

A. Yes.

Q. Did Mr. Gilbert say that he personally had gotten a delivery that day or that another person had gotten a delivery that day?

A. I believe it was another person, not Mr. Gilbert himself.

Q. Did—in the portion of the statement, "I sell for him, but you can't tell him or no one. They will kill me for sure," did Mr. Gilbert indicate with any more specificity as to when he sold for the "him"?

A. No.

Q. Did Mr. Gilbert indicate if he had sold for him on one occasion or more than one occasion?

A. No, he did not specify.

*Id.* at 204–05. The court never gave a limiting instruction telling the jury to consider the statements only as they applied to Gilbert.

The parties also agreed pretrial not to present any evidence concerning the confidential informant upon whose information the search warrant was based. During a hearing, at which Gilbert's attorney was present, the district court clarified to the government that "[p]robable cause will not be an issue for the jury. The jury shouldn't hear anything about the basis for the search warrant. All the jury will know is that the officers had a search warrant

and they had executed it, right?" Yet, at trial, Gilbert's counsel again flouted the district court's pretrial decision and elicited testimony that a "reliable" confidential informant told the police officer that Mayfield was in the apartment when a drug shipment arrived, that Mayfield, but not Gilbert, was listed as a "primary suspect" on the search warrant, but that Gilbert was not listed at all, and that the police officer recognized Mayfield. After Mayfield's counsel objected and moved for a mistrial, the district court gave a limiting instruction that the police officer's testimony should be considered only as it related to the officer's state of mind when he executed the warrant and not for its truth.

Mayfield's attorney made and renewed the motion to sever the trials at least six times before, during, and following the trial. During a hearing regarding the post-trial severance motion, Mayfield's attorney argued that aspects of Gilbert's confession that were brought out at trial by Gilbert's counsel violated his Sixth Amendment Confrontation Clause rights. On October 1, 1997, the jury returned guilty verdicts against both defendants. Mayfield was sentenced to 360 months imprisonment and a ten-year supervised release. Gilbert was sentenced to 240 months imprisonment and a ten-year supervised release.

### STANDARD OF REVIEW

■ A district court's denial of a motion for severance is reviewed for abuse of discretion. *See United States v. Heuer*, 4 F.3d 723, 733 (9th Cir.1993). "The test for abuse of discretion by the district court is whether the joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in just one way, by ordering a separate trial." *United States v. Baker*, 10 F.3d 1374, 1387 (9th Cir.1993) (internal quotations and citations omitted). We have held that severance should be granted when the defendant "shows that the core of the co-defendant's defense is so irreconcilable with the core of his own

defense that the acceptance of the co-defendant's theory by the jury precludes acquittal of the defendant." *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir.1996).

■ Alleged violations of the Confrontation Clause are reviewed de novo. *See United States v. Yazzie*, 59 F.3d 807, 812 (9th Cir.1995).

### I. Mutually Exclusive Discussion

■ Federal Rule of Criminal Procedure 8(b) permits the joinder of defendants who allegedly committed the same crime. Although joinder is generally favored because it promotes efficiency, *see United States v. Tootick*, 952 F.2d 1078, 1080 (9th Cir.1991), Rule 14 provides that the trials may be severed when it is apparent that a joint trial would cause prejudice. The Supreme Court has held that "when defendants have been properly joined under Rule 8(b), a district court should grant severance under Rule 14 only if there is serious risk that a joint trial would prejudice a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Mayfield has shown both that he was denied a specific trial right and that Gilbert's mutually exclusive defense prevented the jury from making a reliable judgment about his guilt or innocence.

■ First, Gilbert's mutually exclusive defense prevented the jury from making a reliable judgment about Mayfield's guilt. "Mere inconsistency in defense positions is insufficient" to warrant severance. *Tootick*, 952 F.2d at 1081. However, the "probability of reversible prejudice increases as the defenses move beyond the merely inconsistent to the antagonistic." *Id.; Zafiro*, 506 U.S. at 542, 113 S.Ct. 933 (Stevens, J., concurring in the judgment). When defendants present mutually exclusive defenses, the jury often cannot "assess the guilt or innocence of the defen-

dants on an individual and independent basis." *Tootick*, 952 F.2d at 1082. "Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant ... [c]ross examination of the government's witnesses becomes an opportunity to emphasize the exclusive guilt of the other defendant ... [c]losing arguments allow a final opening for codefendant's counsel to portray the other defendant as the sole perpetrator of the crime." *Id.*

In short, the situation envisioned by *Tootick* is precisely what happened here. Gilbert's counsel used every opportunity to introduce impermissible evidence against Mayfield, and her closing argument barely even addressed the government's evidence against her client and instead focused on convincing the jury that Mayfield was the guilty party, not her client.

Gilbert's defense and Mayfield's defense were mutually exclusive because "the core of the co-defendant's defense is so irreconcilable with the core of [Mayfield's] own defense that the acceptance of the co-defendant's theory by the jury precludes acquittal of the defendant." *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir.1996). The government claims that Gilbert's defense was that he was simply present in the apartment and that presence is not enough to sustain a conviction. Judge Trott, in dissent, also puts forth this argument. Tellingly, neither can find any support in the record for this assertion.

■ Moreover, the evidence at trial precluded a mere presence defense by Gilbert. Much more than Mayfield, he was linked to both the apartment and the drugs that were found in the apartment. First of all, Gilbert's redacted confession stated that he "sell[s] for an individual," and this con-

fession was admitted in evidence. The government fails to explain how, in light of this unchallenged confession, the jury reasonably could have concluded that Gilbert was merely present in the apartment and not involved in the drug transaction. Second, a police officer testified that Gilbert was handling and attempting to hide the drugs on the table. Third, only Gilbert's fingerprints were found on the drug paraphernalia. Fourth, although both men had keys to the apartment building, there was evidence indicating that Gilbert actually lived there. The apartment was rented in his girlfriend's name, he was there babysitting their child, and the police found a phone bill with Gilbert's name on it. This evidence, which established that Gilbert had significant ties to the apartment and was actively involved in the drug transaction, necessitated Gilbert's attempt to pin the blame on Mayfield. In fact, in the words of Gilbert's counsel, "[o]ur defense is that the drugs—Mayfield purchased the drugs, and he owns the drugs, and they're his drugs; and as long as Mayfield is there, Gilbert doesn't really have physical control over the drugs." [1] Although the government asserts that "it was conceivable that the cocaine belonged to some third party," the record demonstrates that that was not Gilbert's defense, and in fact there was no evidence to support such a defense. It is beyond dispute that, if the jury accepted Gilbert's defense, which was that Mayfield was the drug ringleader who had control over the drugs, it necessarily had to convict Mayfield.

## II. Denial of Confrontation Clause rights

Second, Mayfield has shown that the joint trial "compromise[d] a specific trial right," the right to confront witnesses

---

1. The fact that this statement was made in camera is of no relevance. Gilbert's counsel's actions before the jury were wholly consistent with her in camera admission. Her admission merely confirms what is apparent from reading the entire record. It also supports our conclusion that the district court abused its discretion. Gilbert's counsel frankly told

the district court that her defense was to prosecute Mayfield, which should have put the district court on notice that it was required to grant Mayfield's severance motions or employ other means of stemming the prejudice flowing from Gilbert's mutually exclusive defense.

against him. *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. Mayfield was denied his Sixth Amendment right to confront witnesses against him when the district court allowed a police officer's inculpatory testimony about a "reliable" police informant and when Gilbert's out-of-court confession was introduced against Mayfield. Mayfield was denied the right to cross-examine both witnesses. "The right to cross-examine one's accusers is fundamental in our system of justice. Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *United States v. Marsh,* 144 F.3d 1229, 1240 (9th Cir.1998). Confrontation Clause violations can require a court to sever trials. *See Zafiro,* 506 U.S. at 539, 113 S.Ct. 933; *United States v. Gillam,* 167 F.3d 1273, 1276–77 (9th Cir.1999); *United States v. Sherlock,* 962 F.2d 1349, 1362 (9th Cir.1989).

### A. Informant's statements

■ Mayfield argues that his inability to challenge the statements of a confidential informant who implicated him violated his Confrontation Clause rights. Prior to the start of the trial, Mayfield's attorney and the Government agreed not to present any evidence concerning the confidential informant or the information he furnished to the police, which provided the basis for the search warrant. During cross-examination of the police officer, however, Gilbert's counsel elicited additional facts regarding the basis on which the search warrant was obtained that were irrelevant and that prejudiced Mayfield. This questioning established that (1) according to a "reliable" informant, Mayfield was at the apartment when a drug delivery arrived; (2) Mayfield was listed as a "primary sus-

pect" on the search warrant, but Gilbert was not listed at all; and (3) the police officer who obtained the warrant knew Mayfield from previous encounters. Mayfield objected to this line of questioning, and the district court gave a limiting instruction that the police officer's testimony should be considered only as it related to the officer's state of mind when he executed the warrant and not for its truth. However, the validity of the warrant and the timing of the search were not issues in the case; nor was the officer's state of mind. Rather than striking the objectionable statements entirely, the district court admitted them for no apparent purpose.[2] Even if this erroneously admitted testimony would not have warranted severance on its own, we have no doubt that the combination of the informant's statements, the admission of Gilbert's out-of-court confession (which we address next), and Gilbert's counsel's inflammatory closing argument warranted severance.

### B. Gilbert's confession

■ In addition to the informant's prejudicial statements, the district court allowed a police officer to recount the confession that Gilbert gave soon after being arrested. The original confession stated that Mayfield was the "main man" for whom Gilbert sold drugs. In his statement, Gilbert also urged the police not to tell Mayfield because he would "kill me for sure." The statement was redacted to omit Mayfield's name and to say that Gilbert sold drugs for "an individual." Because Gilbert could not be compelled to take the stand at his own trial, the introduction of Gilbert's confession through the

**2.** Striking the statement would have been a more effective means of eliminating prejudice than allowing the jurors to consider the statement for a limited, but irrelevant, purpose and expecting them to compartmentalize their consideration. The district court itself characterized this task as "mental gymnastics." Judge Trott's dissent relies on the presumption that juries follow their instructions. Yet

the Supreme Court has often recognized, in its Confrontation Clause cases, that there are certain circumstances in which there is a substantial risk that juries will *not* follow their instructions. *See Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 1154, 140 L.Ed.2d 294 (1998).

officer precluded Mayfield from confronting his accuser.

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that, "the substantial risk that the jury, despite [jury] instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of [the] confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126, 88 S.Ct. 1620. Recently, the Supreme Court established that even statements that do not explicitly name a codefendant are forbidden if they are redacted in such a way as to make the naming of the codefendant obvious to the jury. *See Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 1155, 140 L.Ed.2d 294 (1998).

We think that the impermissible inference that Gilbert named Mayfield as the drug ringleader was unavoidable, if not on its face, then certainly in the context of the previously admitted evidence at trial. Although the redacted confession originally referred to "an individual," the testimony elicited by Gilbert established that Gilbert referred to "the main man," meaning the "individual" was a male and was the drug ringleader. In addition, prior to the admission of the confession, the jurors had already improperly heard that Mayfield was a "primary suspect" on the search warrant, but Gilbert was not listed, that a "reliable" informant told police that Mayfield was at the apartment when a drug delivery arrived, and that the police officer who obtained the warrant was familiar with Mayfield. This evidence reinforced what was already fairly obvious from the confession itself: Mayfield was the "main man." As we stated in *United States v. Peterson*, 140 F.3d 819 (9th Cir.1998), the "codefendant was pointing an accusatory finger at someone and it was not difficult for the jury to determine that that person was the other defendant on trial." *Id.* at 822.

Further aggravating the prejudice, Gilbert's counsel argued in her closing that Mayfield was the "main man," who by virtue of his status as the drug ringleader had sole control of the drugs and who threatened Gilbert into not testifying. Although she assiduously avoided actually naming Mayfield, her repeated references to him could not have been more blatant. Only a truly dense juror would not have recognized that Gilbert's counsel devoted her entire closing to discussing the "main man" because Mayfield was the main man and because this inference was necessary to her defense that "when the owner of the drugs is present with his drugs, he shared physical control with no one. Although Gilbert was present, as long as the other was present, he was the one—he was the boss, and he was the one who made the decisions about what would happen with the drugs in this case." Mayfield, of course, was the only person physically present in the room with Gilbert, and we have no doubt that the jury realized this.

The government relies on the Supreme Court's decision in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), for support. However, *Richardson* is distinguishable on several grounds. First, unlike in *Richardson*, the testimony upon which the impermissible inference was based was admitted *before* the confession, so the risk should have been apparent to the district court. Second, unlike in *Richardson*, Mayfield did not trigger the inference by choosing to testify. In *Richardson*, the defendant would have suffered no prejudice if she had not chosen to take the stand. *See id.* at 208, 107 S.Ct. 1702. Third, and most importantly, there was *no* limiting instruction given here. The entire focus of the Supreme Court's analysis has been whether a constitutional violation occurred despite the court's limiting instruction and the accompanying presumption that juries follow such instructions. *See, e.g., Bruton*, 391 U.S. at 126, 88 S.Ct. 1620. In this case, Mayfield requested a limiting in-

struction, yet the district court failed to give one.[3] Thus, there was no safeguard to protect Mayfield from the prejudice flowing from Gilbert's accusation. This fact alone makes the present case considerably different than *Richardson*.

#### C. Zafiro

We also reject the government's argument that the Supreme Court's decision in *Zafiro* precludes our decision. The government reads *Zafiro* too broadly. Because the parties vigorously dispute the import of *Zafiro*, we find it necessary to examine *Zafiro*'s facts and holding in some detail. The question presented in *Zafiro* was "whether Rule 14 requires severance as a matter of law when codefendants present 'mutually antagonistic defenses.'" 506 U.S. at 535, 113 S.Ct. 933. The *Zafiro* Court held that "when defendants have been properly joined under Rule 8(b), a district court should grant severance under Rule 14 only if there is a serious risk that a joint trial would prejudice a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539, 113 S.Ct. 933. The Court then immediately stated that "[s]uch a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Id.* The Court declined to adopt the "bright-line rule" urged by the petitioners that would have "mandat[ed] severance whenever codefendants have conflicting defenses." *Id.* at 538, 113 S.Ct. 933. When defenses merely "conflict" or are "mutually antagonistic," the *Zafiro* Court found, jury instructions or other

measures employed by the district court will often be sufficient to avoid any risk of prejudice. *See id.* at 535, 538, 541, 113 S.Ct. 933.

■ *Zafiro*'s rule that severance is generally not required when there are conflicting defenses is wholly consistent with Ninth Circuit law. We have often refused to hold that a district court abused its discretion despite a degree of conflict between defenses. *See, e.g., Sherlock*, 962 F.2d at 1363 (defenses "were not so irreconcilable as to be mutually exclusive"). At the same time, we have recognized that sometimes defenses can rise to the level of being "mutually exclusive." *See id.*[4] As we stated in *Sherlock*, "[a]ntagonism between defenses is insufficient; the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive." *Id.* Even then, this circuit prior to *Zafiro* "declin[ed] to adopt a per se rule against joinder." *Tootick*, 952 F.2d at 1083. Instead, "defendants must demonstrate that clear and manifest prejudice did in fact occur." *Id.* Thus, contrary to the government's argument, *Zafiro*'s holding that mere conflict between defenses does not require severance as a matter of law did not alter the standard by which we review severance decisions in this circuit.

*Zafiro* also does not require us to affirm because the facts here are significantly different, and because we find that clear and manifest prejudice did indeed occur. The petitioners in *Zafiro* were four individuals charged with distributing illegal drugs. Two individuals, Garcia and Soto, were observed placing a large box in Soto's car and driving to Zafiro's apartment. *See* 506 U.S. at 535, 113 S.Ct. 933. When they

---

**3.** We reject Judge Trott's argument that Mayfield waived the issue by not raising it *twice*. As we stated in *United States v. Marsh*, 144 F.3d 1229, 1240 (9th Cir.1998), a defendant need not raise an issue when it would be a "vain act."

**4.** The use of the term mutually exclusive does not mean that we must reverse both Mayfield's and Gilbert's convictions for the failure

to sever. The nature of their defenses and the *Bruton* error prejudiced only Mayfield. *See Sherlock*, 962 F.2d at 1352 (reversing Sherlock's conviction for failure to sever because he was prejudiced by *Bruton* error but affirming his codefendant's conviction because he was not denied a fair trial). Thus, we affirm Gilbert's conviction in a separate memorandum disposition.

were approached by government agents, Garcia and Soto dropped the box outside the apartment and ran into the apartment. *See id.* at 535–36, 113 S.Ct. 933. The agents followed them inside and found several pounds of various drugs and a suitcase full of cash in the apartment. *See id.* at 536, 113 S.Ct. 933. They also discovered that the dropped box contained 55 pounds of cocaine. *See id.*

At trial, all of the petitioners' defenses were that they personally knew nothing about the drugs and were innocent bystanders. *See id.* Soto and Zafiro testified accordingly. *See id.* None of the petitioners testified that a codefendant was responsible for the drugs, although one did indicate that a codefendant had control over the box. *See id.* Similarly, no out-of-court confessions were admitted that indicated that any of the codefendants were guilty. The only directly accusatory statement was made by Garcia's lawyer, who argued that Garcia was unaware of the box's contents, and the box belonged to Soto. *See id.*[5] This argument, however, was unsupported by any evidence. The jury could have reasonably concluded that Soto and Garcia were ignorant of the box's contents.

The Supreme Court held that these facts were insufficient to require severance. Importantly, the Court stated: "[w]e note that petitioners do not articulate any specific instances of prejudice. Instead they contend that the very nature of their defenses, without more, prejudiced them." *Id.* at 539–40, 113 S.Ct. 933. Given the petitioners' failure to articulate how the joint trial harmed them, the *Zafiro* Court doubted that there was any real risk of prejudice. It nonetheless concluded that "even if there were some risk of prejudice, here it is of the type that can be cured with proper jury instructions." *Id.* at 540, 113 S.Ct. 933. The district court's jury instructions that "opening and closing ar-

guments are not evidence" and that the jury must "give separate consideration to each individual defendant and to each separate charge against him ... sufficed to cure any possibility of prejudice." *Id.* at 541, 113 S.Ct. 933. However, the Court noted that the degree of prejudice and, consequently, the adequacy of limiting instructions will vary from case to case. "The risk of prejudice will vary with the facts of each case, and the district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but ... less drastic measures, such as limiting instructions, often will suffice to cure any prejudice." *Id.* at 539, 113 S.Ct. 933.

The holding in *Zafiro* simply rejects a per se rule requiring reversal based solely upon mutually antagonistic defenses and acknowledges a range of circumstances in which, as here, severance may be required because the inconsistent defenses suggest a heightened risk of prejudice. Specifically, the *Zafiro* Court held that a jury may be prevented from making a reliable judgment "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.... Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant might also present a risk of prejudice." 506 U.S. at 539, 113 S.Ct. 933.

Because *Zafiro* dealt with the unusual situation in which the petitioners contended that the very nature of their defenses, without more, prejudiced them, and in which they pointed to neither specific instances of prejudice, nor specific circumstances that would suggest a heightened risk of prejudice, it does not preclude reversal in Mayfield's case. In fact, it would seem to require it. In this case,

5. Martinez's lawyer did argue that Zafiro may have been involved in a drug conspiracy, but Martinez was unaware of it. *See id.* However-

er, Zafiro did not appeal the denial of severance; thus her claim was not "properly before [the] Court." *Id.* at 537, 113 S.Ct. 933.

Gilbert's counsel used every opportunity to introduce impermissible evidence against Mayfield—evidence that could not have been admitted against Mayfield had he been tried separately. Moreover, Mayfield was denied his Sixth Amendment right to confront witnesses against him when the district court allowed a police officer's inculpatory testimony about what a police informant told him. Those statements established that Mayfield was a 'primary suspect;' that the police knew him from previous encounters; and that, according to this 'reliable' informant, he was at the apartment when a drug delivery arrived. Mayfield's Sixth Amendment rights were further violated by the introduction of Gilbert's out-of-court confession against him, albeit in redacted form, and the subsequent testimony elicited by Gilbert's counsel. These are precisely the sort of circumstances that the *Zafiro* Court envisioned *would* require severance because of the heightened risk of serious prejudice.

■ Although the *Zafiro* Court acknowledged that, even when there is a serious risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any [such] risk …," *id.* the jury instructions in this case did not. Unlike in *Zafiro*, in this case, there was actual evidence indicating Mayfield's guilt that was erroneously admitted. Gilbert's counsel's closing argument also served to reinforce the erroneously admitted evidence and inferences that never should have been put before the jury in the first place. Under these circumstances, we cannot blithely assume that the court's general jury instructions, which included the warning that counsels' arguments are not evidence, were sufficient to ensure that the jury ignored the prejudicial evidence introduced by Gilbert's counsel as well as her forceful closing argument. "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton,* 391 U.S. at 135, 88 S.Ct. 1620; *Zafiro,* 506 U.S. at 544, 113 S.Ct. 933 (Stevens, J., concurring in the judgment).

■ Our conclusion is buttressed by other decisions in this circuit. In both *Tootick* and *Sherlock,* we held that the standard use of jury instructions was inadequate because the district court erred in not reiterating its earlier instructions. *See Tootick,* 952 F.2d at 1083; *Sherlock,* 962 F.2d at 1362. "The judge must actively supervise the trial and, if necessary, reiterate instructions in the wake of prejudicial events." *Tootick,* 952 F.2d at 1085. In *Tootick,* we reversed a conviction even though counsels' arguments were scarcely supported by the evidence. The prejudice in *Tootick* arose largely from counsel's improper arguments, even though "very few of the explicit and detailed allegations in Tootick's opening statement were substantiated with evidence at trial." *Id.* at 1084. *Tootick* thus demonstrates that, in some situations, counsel's arguments may be so blatantly prejudicial that reversal is warranted even if they are not supported by sizeable evidence. However, we need not rely solely on the prejudicial nature of the closing argument because Gilbert's counsel's closing was in fact based on evidence. In fact, to the extent that her argument was not based on innuendo, it was based *exclusively* on evidence that never should have been admitted. This reliance on erroneously admitted evidence compounded the constitutional violations. *See Peterson,* 140 F.3d at 822. The district court should have sternly admonished the jury immediately after Gilbert's inflammatory closing argument.

The prejudice that occurred arose from the interplay between the informant's statement, Gilbert's out-of-court confession, and Gilbert's counsel's closing argument. *Cf. Sherlock,* 962 F.2d at 1362 (prosecutor's improper use of testimony to bolster the case against Sherlock in closing argument "significantly prejudiced Sherlock"). Moreover, she also used the infor-

mant's silence to corroborate Gilbert's confession, arguing:

> Now looking at this from the Government's point of view, what a wonderful witness [the informant] would be. That person has information as to what was going on in that unit shortly before the warrant was served. But that person is not here, and even the powerful U.S. Government can't protect that person. The reason why that person is not here is a safety concern. Additionally, according to Officer Faris, ... Mr. Gilbert said that he had sold drugs for the main man. But he can't reveal that person's name and he can't sign anything because he would be killed for sure.[6]

As indicated by *Tootick* and *Sherlock*, the district court had a duty to police the tactics of Gilbert's counsel, whose goal was to secure an acquittal for her client by proving Mayfield's guilt. *See Tootick*, 952 F.2d at 1083 ("Counsel was given virtually uncontrolled leave to portray [his codefendant] as the sole guilty party."). Mayfield objected on severance grounds at several points prior to, during, and post-trial.[7] Even the government recognized the risk of prejudice and accordingly objected to some of Gilbert's counsel's tactics out of a fear of "run[ning] into mistrial territory." Under these circumstances, the district court abused its discretion by failing to sever or use more rigorous and timely jury instructions to mitigate the prejudice.

### III. Harmless Error

■ In light of our finding that the failure to sever the trials actually prejudiced Mayfield and denied him a fair trial, we see no need in asking whether the error was harmless. Since *Zafiro*, our severance cases generally have framed the inquiry as whether there was prejudice and whether that prejudice was in turn cured by appropriate jury instructions, but have not applied a separate harmless error inquiry. *See, e.g., United States v. Cruz*, 127 F.3d 791, 798–800 (9th Cir.1997); *United States v. Baker*, 10 F.3d 1374, 1386–88 (9th Cir.1993); *United States v. Arias–Villanueva*, 998 F.2d 1491, 1506–08 (9th Cir.1993). Judge Trott's dissent, however, contends that the failure to sever was harmless. We think it is clear that our holding that Mayfield has shown "clear, manifest, or undue prejudice resulting from a joint trial," *Arias–Villanueva*, 998 F.2d at 1506, necessarily means that the error was not harmless. Nonetheless, we assume that harmless error analysis applies and conclude that the error was not harmless "beyond a reasonable doubt." *Peterson*, 140 F.3d at 822. "Whether an error is harmless depends on a variety of factors, including whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony on material points, the extent of the cross-examination, and of course, the overall strength of the prosecution's case." *Id.* (internal quotation marks and citation omitted).

These factors weigh in favor of the conclusion that the error was not harmless. In particular, the evidence was not cumu-

---

**6.** Gilbert's counsel's inflammatory comments did not end there. She continued: "Mr. Gilbert cannot and will not be a snitch. He—a snitch in Jordan Downs will be killed, plain and simple. It's chilling and frightening, but that is the truth. In this case, the silence is screaming the truth at you."

**7.** We disagree with Judge Trott's claim that Mayfield forfeited any right to raise *Bruton* error. First, we are reversing for failure to sever, not on the basis of the *Bruton* errors alone. Second, Mayfield objected vigorously on severance grounds throughout the trial.

Specifically, Mayfield alerted the court to the *Bruton* issue before trial and after trial in his motion for a new trial based on the failure to sever. Finally, even if we agreed that plain error review applies, we disagree with Judge Trott's reliance on *United States v. Wallace*, 848 F.2d 1464 (9th Cir.1988), for the proposition that we may not consider the cumulative effect of errors that were not properly preserved. *Wallace* clearly is to the contrary. *See id.* at 1476 n. 21 ("[We] may consider [unpreserved errors] on cumulative error review.").

lative. *See Gillam,* 167 F.3d at 1277 (error was harmless because it was "merely cumulative of other overwhelming and essentially uncontroverted evidence properly admitted"). If not for the informant's testimony and Gilbert's confession, the jury would have had no basis for concluding that Mayfield was the "main man." Similarly, Mayfield's purported threats to kill the informant and Gilbert were not mentioned by any other witnesses.

As for the strength of the government's case, the properly admitted evidence against Mayfield merely established that he was present in a apartment where drugs were found and that he had cash and a pager. Although these facts are not inconsistent with the conclusion that Mayfield possessed the drugs with the intent to sell them, an at least equally likely inference that the jury reasonably could have drawn was that Mayfield was a friend of Gilbert's merely passing through. There was conflicting testimony about whether Mayfield was walking by the apartment when the police accosted him or whether he ran out the back door of the apartment. Mayfield denied that he was in the apartment. Even assuming that the jury believed the police officers' testimony that Mayfield was in the apartment and fled out the back door, Mayfield's lie about being in the apartment may indicate no more than that he did not want it known that he was consorting with a drug dealer. Simply put, there is no "overwhelming" evidence indicating that Mayfield was in control of the drugs or even involved in the transaction. *See Marsh,* 144 F.3d at 1240 (despite government's "strong case" and a "not very plausible defense," error was not harmless).

Indeed, given Gilbert's more extensive ties to the apartment and police testimony that only Gilbert was seen handling and disposing of the drugs and only Gilbert's fingerprints were found on the drug paraphernalia, the jury easily could have concluded that Gilbert was the "main man,"

and Mayfield was merely present. These facts, which made it more likely that Gilbert would be convicted at the outset, inspired Gilbert's counsel to shift the blame to Mayfield by any means possible. This is a situation in which "the prosecutor's own case in chief [was] marginal and the decisive evidence of guilt [was] left to be provided by a codefendant." *Zafiro,* 506 U.S. at 543, 113 S.Ct. 933 (Stevens, J., concurring in the judgment). The error was not harmless.

*CONCLUSION*

For the foregoing reasons, we REVERSE Mayfield's conviction and REMAND for a new trial.[8]

TROTT, Judge, dissenting:

I respectfully dissent from the majority's decision to reverse Mayfield's conviction and remand for a new trial. The district court neutralized the erroneous admission of the confidential informant's statements with a limiting instruction. Mayfield forfeited any claim of error under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Gilbert and Mayfield did apparently seek to point the finger at each other during the trial, but their defenses did not qualify as mutually exclusive under *Zafiro v. United States,* 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Most importantly, however, if any error did occur in trying Gilbert and Mayfield together, the overwhelming individualized evidence against Mayfield renders that error harmless beyond a reasonable doubt. I would affirm the district court's refusal to grant a new trial.

**I**

The confidential informant's statement was hearsay and had the potential to prejudice Mayfield. Recognizing this danger, the district court properly sanitized the statement through a limiting instruction:

---

**8.** Given our conclusion, we need not address    Mayfield's additional arguments for reversal.

[Y]ou are instructed that you're not to consider the information the informant said about Mayfield for the truth of the matter, but you're only to consider it as it gave the officer the reason to conduct the search at that particular time.

Reliance on the jury is a central tenet of our criminal justice system, and the law is clear that we assume the jury's ability to follow limiting instructions. *Ortiz–Sandoval v. Gomez,* 81 F.3d 891, 899–900 (9th Cir.1996) (citing *Zafiro,* 506 U.S. at 540, 113 S.Ct. 933). The majority simply bypasses this principle when relying on the hearsay testimony to grant a new trial.

## II

Although a pretrial motion raised the *Bruton* concern regarding Gilbert's confession, Mayfield conceded during argument on his motion for a new trial that Gilbert's statement, as introduced, was properly redacted. Mayfield waived the right to contest this issue on appeal. *United States v. Perez,* 116 F.3d 840, 844–45 (9th Cir.1997) (en banc); *United States v. Baldwin,* 987 F.2d 1432, 1437 (9th Cir.1993) (holding that the defendant waived any claim of error in the failure to give a jury instruction by saying he did not believe the instruction was necessary).

Furthermore, Mayfield did not object to the admission of Gilbert's statement at trial or renew his request for a limiting instruction. Under these circumstances, we review the failure to give a limiting instruction for plain error. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Because of his failure to object, Mayfield must demonstrate that he was prejudiced by the lack of a limiting instruction. *Id.* at 734, 113 S.Ct. 1770. He makes no attempt to do so.

Because any *Bruton* error was not properly preserved for appeal, *we do not consider* the possibility of error when asking whether the cumulative effect of many errors at trial prejudiced Mayfield. *See United States v. Wallace,* 848 F.2d 1464,

1476 n. 21 (9th Cir.1988) (citing *United States v. Berry,* 627 F.2d 193, 200 (9th Cir.1980)). Relying on an unpreserved claim of error to conclude that Mayfield should have a new trial takes the panel majority's opinion out of the realm of the suspect into the realm of simply wrong.

## III

Finally, although the majority believes Gilbert and Mayfield presented mutually exclusive defenses, *we are bound* by the Supreme Court's decision in *Zafiro* to hold that they did not. In *Zafiro,* each of two defendants claimed that a box full of drugs belonged to the other, seeking acquittal by placing the blame elsewhere. 506 U.S. at 536, 113 S.Ct. 933. Citing jury instructions closely comparable to those that the district court gave in this case, the Court held that any possibility of prejudice was cured. *Id.* at 541, 113 S.Ct. 933.

The majority attempts to limit *Zafiro* by distinguishing between "conflicting" and "mutually exclusive" defenses. *Ante* at 903. However, the Supreme Court understood that some conflicting defenses could rise to the level of being mutually exclusive, clearly identifying our opinion in *United States v. Tootick,* 952 F.2d 1078 (9th Cir.1991), as a *rare example* of irreconcilable defenses. *Zafiro,* 506 U.S. at 538, 113 S.Ct. 933; *see also United States v. Gillam,* 167 F.3d 1273, 1276–77 (9th Cir.1999) (referring to the "extraordinary record" at issue in *Tootick* ). In *Tootick,* the victim had been injured in a violent assault, and only the two co-defendants were implicated. 952 F.2d at 1081. Each sought to place blame on the other. *Id.* In *Zafiro* and the case at bench, by contrast, the core of the defenses was each individual's lack of culpability. Gilbert argued that he was merely present in the apartment where the drugs were found. Mayfield argued that he was not there and that the drugs were not his, either. The jury could have accepted both defenses.

### Conclusion

The evidence was overwhelming with regard to Mayfield's guilt. Three officers testified that he was present in the apartment, *at the table* with the drugs. Mayfield was apprehended just after stepping outside the door and had nearly $2,000 in cash in his pockets. Mayfield had keys to the apartment. Apart from any claimed trial errors, this testimony presents an open-and-shut case of possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1994). If there was error, it was harmless beyond a reasonable doubt.

I respectfully dissent.